IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| ALISON WAINWRIGHT DAVITT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:19cv00456 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| VIRGINIA POLYTECHNIC | ) | |
| INSTITUTE AND STATE | ) | |
| UNIVERSITY \|COMMONWEALTH | ) | |
| OF VIRGINIA | ) | By: Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendants. | ) | |

Plaintiff Alison Davitt brought this case under Title VII of the Civil Rights Acts of 1964, alleging that Defendant Virginia Polytechnic Institute and State University ("Virginia Tech") discriminated against her based on her sex, created a hostile work environment, and terminated her in retaliation for protected activity. The case is now before the court on Defendant's motion for summary judgment. Because Davitt has not established discrimination based on sex or a hostile work environment, the court will grant summary judgment on those claims. But Davitt's evidence raises a genuine question of material fact as to whether her termination was retaliatory. The court will therefore deny summary judgment on her retaliation claim.

## I.   BACKGROUND

In 2016, Plaintiff Alison Davitt began working as the Assistant Dean of Advancement at Virginia Tech's College of Veterinary Medicine. For the first year of her employment, she received positive performance reviews and, by all accounts, had an amicable relationship with

her coworkers. Davitt's position reported to two supervisors, the Vice President of Development and the Dean of the Veterinary College. When Davitt began her employment, those positions were filled by Michael Moyer and Dr. Cyril Clarke, respectively. In November of 2017, Virginia Tech appointed Dr. Clarke as interim provost and installed Dr. Gregory Daniel as interim Dean of the Veterinary College. Almost immediately, Davitt and Dr. Daniel developed an acrimonious professional relationship.

Davitt alleges that the situation progressed beyond mere professional disagreement into actionable harassment and discrimination beginning in January 2018. She describes a meeting during that month in which Dr. Daniel "pinched and played with his nipple in a suggestive manner for forty-five minutes." (ECF No. 1 at 6.) After the meeting, Davitt approached Moyer with concerns about Dr. Daniel's behavior. Moyer responded by contacting Virginia Tech's Office of Equity and Access, the entity tasked with handling discrimination complaints within the university. To follow up on Moyer's report, a representative from the Office of Equity and Access, Nikeisha Arthur, called and emailed Davitt to inquire if Davitt wished to file an official complaint regarding the incident. Davitt asked if such a complaint would be anonymous and was told it would not be. She therefore declined to file a complaint out of fear of retaliation.

Davitt also testified that Dr. Daniel engaged in inappropriate behavior with one of Davitt's subordinates, Alison Elward. According to Davitt, Elward reported that Dr. Daniel sat across from her at a one-on-one meeting and massaged his thighs throughout the meeting before getting up and rubbing Elward's shoulders as he left. Davitt reported Elward's account to the Office of Equity and Access, which reached out to Elward. Elward, in turn, told Arthur

that Dr. Daniel's conduct was not "in any way intimidating or sexual." (*Id.*) Instead, she characterized Dr. Daniel's behavior as a nervous tic, or something associated with a medical condition. (ECF No. 52-3 at 26.)

After these incidents, Davitt asserts that her fears of retaliation became manifest. She alleges that Dr. Daniel regularly harassed and abused her in their meetings. In addition to consistently undermining her in group meetings, she alleges that Daniel would regularly yell at her and verbally abuse her in their one-on-one meetings. Most vividly, Davitt recounts an incident on August 14, 2018, wherein Dr. Daniel allegedly became so angry with her that he became bright red, leaned over his desk, and yelled at her so vociferously that she could feel his spittle hitting her face. (*See id.* at 10.) Davitt reported this incident to Moyer, who arranged a meeting between himself, Davitt, and the Director of Human Resources for the Advancement Division, Stephen Filipiak. Davitt alleges that Moyer told her in that meeting that he wished he could move her to another position (instead of moving or punishing Dr. Daniel), insinuated that she was "not going to win" any dispute to Dr. Daniel, and advised her to use "feeling statements" when expressing frustration with Dr. Daniel. As she puts it, "it was very clear to me that he was asking me, '[w]hy are you bothering to pursue this if you know that it is not going to end in your favor?'" (ECF No. 52-1 at 240.)

After her meeting with Moyer and Filipiak, Davitt once again contacted Virginia Tech's Office of Equity and Access and spoke with Arthur. She informed Arthur that she felt threatened and retaliated against by Dr. Daniel, and Arthur responded by suggesting mediation. Davitt declined and asked about filing a formal complaint, but Arthur cut the call

short to attend a meeting. Davitt sought to follow-up but received no response until September 24, when Arthur finally emailed her the paperwork to file a formal complaint.

On September 6, Davitt emailed Filipiak to inquire if he had communicated with the Office of Equity and Access about her complaints. The email also contained extensive complaints about Dr. Daniel's behavior towards Davitt and other women at Virginia Tech. In addition to accusations of sex discrimination, Davitt informed Filipiak that she believed Dr. Daniel was incompetent and interfering with her ability to perform her job. She also made veiled threats of litigation if "this issue isn't resolved through other complaints or internal systems or a new dean is appointed." (ECF No. 52-7 at 2.) Filipiak forwarded the email to Moyer, who responded, "Ugh." (*Id.* at 1.)

On October 3, 2018, Moyer and Dr. Daniel conducted Davitt's annual performance review, which was far more negative than her 2017 review. Where her review the year prior had stated that she exceeded expectations in almost every performance metric and characterized her efforts as "a resounding success," her 2018 review was negative in all but one metric. The review extensively cited Davitt's negativity and "strained relationships" within the college. It also noted her "lack of judgment in communication through email with colleagues." (ECF No. 52-6 at 6.) Davitt alleges that this negative performance evaluation was retaliation for her complaints against Dr. Daniel.

The following day, on October 4, 2018, Moyer presented Davitt with a letter of non-reappointment. The letter effectively gave Davitt notice that she would be terminated one year from its issuance. She was immediately stripped of all job responsibilities but continued to receive her salary for one year.

Davitt now brings this suit claiming that Virginia Tech discriminated against her based on her sex in violation of Title VII.[1] She alleges that the school terminated her based on her sex, created a hostile work environment through sex discrimination, and retaliated against her for her complaints of discrimination.

## II.   ANALYSIS

Davitt's Title VII discrimination and hostile work environment claims cannot survive summary judgment. She has failed to demonstrate any adverse employment action or severe and pervasive harassment based on sex. Her retaliation claim, on the other hand, presents genuine disputes of material fact. Davitt undertook protected actions, her employers were aware of those actions at the time of her non-reappointment, and they directly referenced them as justification for her termination. This is more than sufficient to create a genuine issue of material fact with respect to retaliation under Title VII.

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the

---

[1] Davitt's complaint also contains counts under the FMLA and Rehabilitation Act. She voluntarily forfeited those claims on summary judgment. (*See* ECF No. 52 at 2.)

governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot

grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

### A. Davitt has not shown disparate treatment on the basis of sex

Davitt's first claim is that she was terminated in violation of Title VII. To succeed on such a claim, she must show "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that similarly-situated employees outside the protected class received more favorable treatment." *Gerner v. Cnty. of Chesterfield*, 674 F.3d 264, 266 (4th Cir. 2012). Defendants do not dispute that Davitt is a member of a protected class or that she experienced an adverse employment action. (*See* ECF No. 45 at 11.) Therefore, the only questions before the court are whether Davitt exhibited satisfactory job performance and whether she was treated differently than similarly situated male employees.

Davitt cannot demonstrate that she was treated differently than similarly situated male employees and therefore cannot make out a Title VII discrimination claim. The only evidence in the record regarding Virginia Tech's allegedly discriminatory conduct is Davitt's uncorroborated opinion that Dr. Daniel treated men differently than he treated her. (*See* ECF No. 52 at 30.) Davitt does not provide any details, only her general sense that men received better treatment. Davitt was directly questioned on this issue in her deposition when Defendant's counsel pushed her for any specific example of disparate treatment at Virginia Tech. Despite being given multiple opportunities, she was unable to name any similarly situated individual man who was treated differently or identify any concrete practice of disparate treatment. (*See* ECF No. 52-1 at 70–72, 162–68.) She further stated that she was unaware of whether Dr. Daniel yelled at or berated her male colleagues as he did her. (*See id.*

at 162–68.) At one point, she identified a man she believed was treated differently, a Dr. Erskine, but subsequently admitted both that Dr. Daniel "may or may not have" treated Dr. Erskine similarly to the way he treated Davitt, and that Dr. Erskine was not similarly situated because of his different position in the organization. (*See id.* at 163, 165–66.) Because Davitt has provided no evidence of disparate treatment other than the bare opinions in her deposition, the court is not aware of any particular man who was treated differently than Davitt or of any specific practice of disparate treatment.

An unadorned opinion from a plaintiff that a defendant generically treated men differently than he treated her is insufficient to create a genuine issue of material fact as to the fourth element of the Title VII test. *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 609 (4th Cir. 1999) (holding that an opinion of discriminatory evidence did not create a genuine issue of material fact where it was not supported by "specific factual examples"); *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988) ("[Plaintiff]'s own naked opinion, without more, is not enough to establish a prima facie case of… discrimination."). It a plaintiff's burden to produce evidence beyond mere unsupported opinion and failure to do so is fatal at summary judgment. *See Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985) ("Unsupported allegations as to [discriminatory] motive do not confer talismanic immunity from Rule 56."). This is particularly true here, where Davitt was given multiple opportunities to provide factual evidence of disparate treatment and failed to do so. With only her bare allegations to support her claim of disparate treatment, Davitt's Title VII discrimination claim cannot survive summary judgment.

**B. Davitt has not shown severe or pervasive unwelcome conduct based on sex**

Davitt's second claim is that Virginia Tech created a hostile work environment through Dr. Daniel's conduct and its response to her complaints. To establish a claim for a hostile work environment under Title VII, the plaintiff must show that "(1) the subject conduct was unwelcome; (2) it was based on [the sex] of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's terms and conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). The parties dispute only the second and third elements. (*See* ECF No. 45 at 14–17.)

The test for severe or pervasive conduct based on sex has both subjective and objective components, and it requires a plaintiff to establish that "she perceived—and that a reasonable person would so perceive—the environment to be abusive and hostile." *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 208 (4th Cir. 2014). In applying this test, the court must consider the totality of the circumstances faced by the plaintiff, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). In order to be actionable, the "conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). A hostile work environment is one "pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 316 (4th Cir. 2008) (internal quotation marks omitted) (quoting *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007)). Mere "rude treatment by [coworkers]," *Baqir v. Principi*, 434

9

F.3d 733, 747 (4th Cir. 2006), or "callous behavior by [one's] superiors," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), are not actionable under Title VII.

Davitt alleges six instances/patterns of conduct that she alleges created a hostile work environment:

> (1) [S]he had to witness her supervisor sexually grope himself for forty-five minutes in an intimidating one-on-one meeting; (2) she fielded a complaint from a subordinate employee regarding a similar incident; (3) she was aggressively berated and screamed at in contrast to male employees; (4) she was informed complaints about this conduct would not be successful and was discouraged from pursueing [*sic*] them; (5) she was chastised in a performance evaluation for having made a protected activity; and (6) she was wrongfully terminated from her employment. (ECF No. 52 at 32.)

Of these allegations, only the first, the nipple-rubbing incident, supports a hostile work environment claim. The second and third—Elward's complaint and Daniel's actions—do not allege conduct based on Davitt's sex. *See infra* Section II.A. The sixth allegation, that Virginia Tech wrongfully ended Davitt's employment, cannot logically be considered when determining whether Virginia Tech's conduct altered Davitt's work environment. After Davitt's termination, she was no longer in the working environment she alleges was hostile.[2]

While the fourth and fifth allegations, those centering on Davitt's meetings with her supervisors, present conduct based on sex (or at least protected activity under Title VII), they do not involve harassing or abusive conduct of the kind that could support a hostile work environment claim. Even by Davitt's own telling, her meetings with Moyer, Filipiak, and Dr.

---

[2] This case is somewhat unique in that Davitt's termination came in the form of a non-reappointment, meaning she technically remained employed by Virginia Tech for one year after termination. However, her termination did end all of her working relationships with Virginia Tech employees and her obligation to be physically present at Virginia Tech. Thus, the analysis still applies despite the unusual circumstances of this case.

Daniel were courteous and professional. In fact, Davitt herself expressly characterized Moyer's conduct as "professional" when discussing her performance evaluation and the meeting in which he allegedly discouraged her from pursuing her complaints. (*See* ECF No. 52-1 at 28.) Likewise, she makes no allegations that the administration of her performance review was in any way unprofessional. As described by Davitt, the relevant meetings did not involve rude or callous treatment, much less the kind of abuse that could give rise to a hostile work environment claim. Virginia Tech's allegedly poor handling of Davitt's complaints may be actionable under another Title VII theory (and indeed, the Court concludes below that the incidents support a *prima facie* case of retaliation), but it was not the kind of harassing conduct that could create a hostile work environment.

This leaves only the nipple-rubbing incident. While "viable hostile work environment claims often involve repeated conduct… an isolated incident of harassment can amount to discriminatory changes in the terms and conditions of employment, if that incident is extremely serious." *Boyer-Liberto*, 786 F.3d at 277  (cleaned up). For example, the Fourth Circuit has held that incidents of particularly egregious racial epithets or threats, such as odious racial epithets or racially tinged death threats, can serve as the basis for a hostile work environment claim. *Id.*; *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 496 (4th Cir. 2015).

The isolated nipple-rubbing incident is not "[so] extreme [as] to amount to a change in the terms and conditions of [Davitt's] employment." *Faragher*, 524 U.S. at 788. Put another way, the incident is not comparable to the issuance of death threats or the use of the most objectionable terms of racial abuse. Davitt herself declined to characterize the incident as particularly egregious, saying only that she understood that Dr. Daniel's actions to have "a

certainly underlying sexual undertone that [was] suggestive." (ECF No. 52-1 at 36.) One incident with an "underlying sexual undertone" is not sufficient to render a work environment hostile. Davitt does not allege that Dr. Daniel said any unwanted words, made any threatening actions, or engaged in any harassment beyond rubbing his nipples. It bears repeating that the focus of a hostile work environment analysis is not whether a supervisor has engaged in harassing or unwanted behavior; if it were, Davitt's allegations would suffice. Instead, the court must determine whether Davitt's workplace was "permeated with discriminatory intimidation, ridicule, and insult…[so] extreme [as] to amount to a change in the terms and conditions of employment." *Sunbelt Rentals, Inc.*, 521 F.3d at 315. While Dr. Daniel's alleged conduct is objectionable, it is not so severe as to have permeated Davitt's work environment with discrimination such that the very conditions of her employment were altered. Because Davitt alleges no other incidents that meaningfully add to her hostile work environment claim, it cannot survive summary judgment.

## C. There are genuine issues of material fact with respect to Davitt's retaliation claim

Despite her inability to show discrimination under Title VII, Davitt's evidence raises genuine questions of fact as to whether her termination was in retaliation for a protected activity under Title VII. Namely, her complaints about Dr. Daniel's behavior may have been a motivating factor in her non-reappointment.

To establish retaliation under Title VII, a plaintiff must show that "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Ziskie v. Mineta*,

547 F.3d 220, 229 (4th Cir. 2008). Davitt argues that her complaints regarding Dr. Daniel were protected activity and that her complaints were causally linked to her non-reappointment.

Davitt's verbal and written complaints to Moyer and Filipiak clearly qualify as protected activity. In order to engage in protected activity under Title VII, an employee need only "oppose[] any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). The actual protections of this provision run even broader than the language would suggest, protecting any employee who opposes a practice she reasonably believes to be unlawful under Title VII. *See Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006). Protected activity can include many different courses of conduct, including "voicing one's own opinions in order to bring attention to an employer's discriminatory activities and complain[ts] . . . about suspected violations." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005) (quoting *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003). This standard clearly encompasses Davitt's numerous complaints, including the email she sent to Filipiak only a week before her termination.

Davitt has also demonstrated a genuine issue of material fact with respect to the causal relationship between her protected activity and her termination. There are at least four compelling pieces of evidence showing a possible causal relationship between Davitt's protected activity and her termination. First, and most striking, Davitt's performance evaluation—a document created by her supervisors and given to her one day before her termination—appears to directly reference her protected activity as problematic. The evaluation chides Davitt for her "lack of judgement [*sic*] in communication through email with colleagues." (ECF No. 52-6 at 6.) This mirrors the language Moyer used to describe Davitt's

13

email complaint about Dr. Daniel's behavior. (*See* ECF No. 52-2 at 89–90.) Second, Davitt's 2018 review is also a drastic departure from Virginia Tech's prior evaluation of her performance. Davitt's 2017 performance review is glowing while her 2018 review is negative, bordering on harsh. This disparity is not direct evidence of retaliatory animus, but it, combined with the explicit language of the performance review itself, certainly provides a basis from which a jury could infer a causal relationship. Third, the 2018 review and its overwhelmingly negative feedback were not preceded by any formal warning that Davitt's performance had dipped. Virginia Tech appears to have made no official efforts to improve Davitt's performance or even warn her that she was in danger of termination. This lack of warning raises questions about Defendant's motive for the termination. Finally, Davitt's protected activity occurred in close temporal proximity with her termination. The email referenced in her performance review was sent less than a month before her termination, suggesting a causal relationship between these two events. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015) (temporal proximity of one month "tends to show causation"). Underscoring the possible causal relationship, both Moyer and Filipiak admitted that they discussed Davitt's accusations in determining whether to issue her a letter of non-reappointment. (*See* ECF Nos. 52-2 at 108–09; 52-8 at 27–28.)

Defendant's responses are unpersuasive. Its primary arguments—that Davitt did not engage in protected activity, that her complaints were temporally distant from her termination, and that the relevant stakeholders were not aware of her complaints—are factually inaccurate. As discussed above, Davitt engaged in protected activity only one month before her termination in an email that reached Moyer, one of her supervisors. Defendant relies heavily

14

on Dr. Daniel's alleged ignorance of the accusations, but this reliance is misplaced for two reasons. First, Davitt's suit is against the school, not Dr. Daniel. Moyer, who was also Davitt's supervisor and jointly responsible for her non-reappointment, was unquestionably aware of her accusations. Second, Dr. Daniel admitted in his deposition that the Office of Equity and Accessibility reached out to him to set up a meeting regarding Davitt's claims in May of 2018, well before her termination. (*See* ECF No. 53.) In sum, the record evidence strongly supports Davitt's theory that her non-reappointment was in retaliation for engaging in activity protected by Title VII.

### III.   CONCLUSION

Davitt's inability to show discrimination or harassment based on sex is fatal to her Title VII discrimination and hostile work environment claims. However, her evidence raises a genuine question regarding whether Virginia Tech terminated her employment for engaging in protected activity, and thus her retaliation claim must survive summary judgment. For those reasons, the court will enter judgment for Defendant on Davitt's Title VII discrimination and hostile work environment claims but will deny Defendant's summary judgment motion as to her retaliation claim. That claim will go to a jury.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 15th day of March, 2021.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE